[Civ. No. 4191.   Second Appellate District, Division One.—May 24, 1924.].

INGLE MANUFACTURING COMPANY (a Corporation), Respondent, v. SAN DIEGO OIL PRODUCTS CORPORATION (a Corporation), Appellants.

[1] SALES—MANUFACTURE OF GALVANIZED IRON TANKS—WARRANTY—FINDINGS—EVIDENCE.—In this action to recover the agreed purchase price of certain galvanized iron tanks which plaintiff guaranteed against leaks before leaving plaintiff's factory, the platforms on which the tanks were to rest having been furnished and constructed by the defendant, the evidence was sufficient to support the findings of the trial court that platforms were not accepted by the plaintiff; that the plaintiff assumed no obligations in regard to the foundations furnished by the defendant; that the tanks did comply with plaintiff's written guarantee and did comply with the express warranty found in section 1770 of the Civil Code, and were reasonably fit for the purpose for which they were manufactured, and that the leakages were caused by the defective platform furnished by the defendant.

[2] APPEAL—FINDINGS—JUDGMENT.—Where the findings are supported
   by the evidence, the judgment based thereon will not be disturbed
   on appeal.

(1) 35 Cyc., p. 465.    (2) 4 C. J., p. 877, sec. 2853.

APPEAL from a judgment of the Superior Court of San
Diego County. S. M. Marsh, Judge. Affirmed.

The facts are stated in the opinion of the court.

Wright & McKee for Appellant.

Joseph S. Campbell for Respondent.

HOUSER, J.—The defendant appeals from a judgment
rendered in favor of the plaintiff in an action brought to
recover the agreed purchase price of $2,396 for twelve gal-
vanized iron tanks, each of the capacity of 8,189 gallons.

The contract was evidenced by certain letters passing be-
tween the parties. Of such letters those which are con-
sidered of material consequence in determining this contro-
versy specified that the tanks be guaranteed against leaks
before leaving plaintiff's factory, and that the tanks be
placed on platforms not exceeding twelve inches in height.
The construction of the tanks was commenced at the plain-
tiff's factory, but was completed on the property of the de-
fendant. The platforms on which the tanks were to rest
were furnished and constructed by the defendant, and while
used for the purpose for which they were intended, the trial
court found that they were not "accepted by the plaintiff,"
and "that the plaintiff assumed no obligations in regard to
the foundations furnished by the defendant." The court
further found: "That said tanks did comply with plain-
tiff's written guarantee and did comply with the express
warranty found in Civil Code section 1770, and were reason-
ably fit for the purpose for which they were manufactured;
that four of said tanks leaked to the extent of 295¾ gal-
lons, but that the plaintiff was not responsible for the leaks
for the reason that the foundation upon which said tanks
were placed and which foundation was furnished by the de-
fendant, was not substantial and presented an uneven and

2. See 2 Cal. Jur. 918; 2 R. C. L. 202.

yielding surface, and that the leakages were caused by the defective platform furnished by the defendant, and that the plaintiff is not responsible therefor; that the said tanks were not defective in workmanship.''

If it be determined with reference to the tanks which leaked that all the warranties, express as well as implied, were fulfilled by the plaintiff, or that such tanks leaked because of the fault of the defendant, the plaintiff was entitled to judgment; on the other hand, if the leaks were caused by the fault of the plaintiff, the judgment should be reversed. That part of the contract which provided that the tanks should be guaranteed against leaks *before leaving the factory of the plaintiff*, was modified by implied consent of the parties in that the tanks were only partially constructed at the factory of the plaintiff and the tanks were completed at the plant of the defendant. It must therefore have been within the contemplation of the parties as a part of such modification that, whether constructed at the plaintiff's factory or at the defendant's plant (without reference to the foundation on which the tanks rested), the tanks would be free from leaks on their completion. The warranty contained in section 1770 of the Civil Code, covering the manufacture of articles in the class in which the subject matter of this action falls, is to the effect that these tanks were guaranteed by the manufacturer to be reasonably fit for the purpose for which they were made. As shown by the findings, considering the fact that the tanks leaked only to the extent of 295¾ gallons, which was less than one-tenth of one per cent of the aggregate of 342,627 gallons of oil contained in the tanks during their use of about four months; or, to put the matter more concretely, about one drop out of 16,000 drops in a one week's storage of oil—the conclusion by the lower court that the tanks did comply with the terms of the contract between the parties, as well as with the warranty as contained in and required by the provisions of section 1770 of the Civil Code, does not seem entirely unreasonable. But assuming that the aggregate capacity of the tanks was about 98,000 gallons, the week's leakage, instead of being represented by one drop out of 16,000 drops, would be shown by a loss of three drops out of 16,000, or slightly less than one-half a drop per day. The contract was uncertain in its terms as to who was obligated to construct the foundation; but in view of the

construction placed upon the language of the contract by the parties thereto, and the consequent assumption by the defendant of that part of the contract, it must be presumed that the intention was that such duty was to devolve upon the defendant. The testimony of the plaintiff's superintendent, as taken from the transcript on appeal, is as follows: "When I first went out to the defendant's plant, I wanted to know where the tanks were going to be placed. Mr. Peacock showed me where the tanks were to be located and asked me about the foundation. He asked me if a base of scrap lumber he had there, of various lengths, breadths and thicknesses, would do. I said 'No.' He asked if the tanks could be set right on the ground—I said they could but the chemical action that would result would cause holes and leaks. Then he asked me if a base made of some three inch by eight inch planks about ten feet long would do. I replied if they were placed on the ground, properly leveled, they would in my judgment serve the purpose all right. The defendant's men then leveled off the ground and placed boards for us to put the tanks on. I should say these planks were laid from two to three inches apart. The first supply of planks were of uniform length, of about sixteen feet long, but they were exhausted before they had enough foundation. After that, defendant got some other planks which were mostly two by twelve, and of various lengths to complete the foundations. I should judge five or six tanks were placed on the planks of uniform length and thickness. Some of the planks were so placed that the ends of the planks were beneath tanks. I should judge every other tank had plank ends beneath it. The tanks were eleven feet in diameter and were set from a foot to eighteen inches apart. . . . We had heavy rain fall after the first day or two we were on the job, which prevented our completing the tanks right away. . . . The eaves of the shed covering the tanks containing the crude oil emptied just about on the edge of the platforms which were beneath the tanks we built. . . . The water that flowed off this roof flowed right on the ground in and around these tanks. . . . The ground around and about the platform upon which the tanks were placed was soaked with water."

With reference to the effect upon the tanks produced by the manner of construction of the platforms and their surroundings, the same witness stated: "The tanks were leak-

ing because the seams had cracked in one or two places causing leaks. . . . I concluded these cracks were caused by the settling of the foundation. I found some planks had settled more than others and that the planks were not even on a level. In some places planks had settled so much that they no longer touched or supported the tank. I found a leak at one such place where one plank was high and the planks on either side had settled so they were three-fourths of an inch below the bottom of the tank. Such an unevenness of the foundation would cause the bottom of the tank to bulge and put an unnecessary strain on the seams. This would tend to crack open the solder and cause a leak. A full tank of oil would weigh approximately 56,000 pounds; that would make a weight of about 580 pounds per square foot all over the surface of the bottom of the tank. That weight would be sufficient to draw and open the seams at the bottom of the tank if it was resting upon an uneven surface. I called the attention of defendant's men to the fact that the foundation was not level, in several instances, when they were laying the planks; then, later, when I went down to the plant to repair leaks I called to Mr. Peacock's attention the fact that the foundation was not level in places. He said he would fix it, but he did not do so. . . . If the foundations of the tanks were not level that would cause strains on the sides of the tanks. That strain might appear anywhere on the body of the tanks and it would cause the tank to draw at the joints. . . . Where I put the stove bolts in the bottom, the tanks were leaking where the solder had cracked on the seam. I believe it was the strain caused by the unevenness of the foundation that made the solder crack.'' Another witness stated: ''I suggested that to remedy the faulty foundation the planks should be brought up together, that the ends be matched up, not left staggered, and that they be braced underneath. The foundation consisted of loose planks laid on the ground. These planks were not of uniform thickness and the ends of the planks were so arranged that some joints were beneath the tank. In some places the ground had settled so that the tanks were not resting on the planks as they should have been. The bottoms of the tanks were in places suspended between the planks.'' A third witness testified that: ''The foundations were not even, that is, the surface of the planks was not even. Some of the planks had settled away from the bot-

tom of the tank.  I should say that in one place there was approximately three-fourths of an inch between the plank and the tank. . . . From what I have observed I can tell the effect on galvanized tanks of the character of those I saw in this case.  If they were filled with oil and the foundations on which they were setting was unlevel I know the unlevelness at the joints would cause a drawing and stretching of the metal which would pull a seam apart on a joint where it was soldered.''

The contract, as far as the warranty against leaks was concerned, originally contemplated that the tanks would not leak before leaving the factory.  Consequently any question of the tanks being placed either on the bare ground, or on a plank foundation, or on a cement foundation, was not considered by the parties as having anything to do with the subject of whether on their completion the tanks would leak or not.  If immediately upon completion of their manufacture, and assuming that they might have been tested while resting temporarily on the bare ground or elsewhere, it had been found that the tanks were free from leaks, they would have met the condition of the contract that they were guaranteed against leaks before leaving the factory.  Where or in what position the tanks were ordered to be placed by the defendant (other than that plaintiff should not be compelled to install them on foundations over twelve inches in height) was of no concern of the plaintiff and had nothing to do with the requirement that they be free from leaks on the completion of their manufacture.  The location of the tanks and the conditions which were to surround them rested entirely within the control of the defendant.  As the findings of the lower court show were the actual conditions, ''the foundation upon which said tanks were placed, and which foundation was furnished by the defendant corporation, was not substantial and presented an uneven and yielding surface, and that the leakages were caused by the defective platform furnished by the defendant.''

The statement made by respondent's superintendent that in his judgment the planks would ''serve the purpose all right'' for the foundation if the ground were properly leveled, even though coupled with the use by plaintiff of such foundations, cannot be taken as a modification of the guaranty of the tanks against leaks before leaving the factory, especially in view of the testimony that attention was re-

peatedly called to the fact that the foundation was not level and that defendant's superintendent said "he would fix it," but that he did not do so. The evidence shows that after the tanks were completed, and during the time that the parties were considering the leaky condition of the four tanks, the cause of the leaks was entirely attributed to the faulty foundations upon which the tanks rested. The judge of the trial court made a personal examination of the tanks and presumably based his conclusions as to their fitness partly upon his observations and partly upon the testimony of witnesses. It very satisfactorily appears from the evidence that the defendant assumed the responsibility of constructing the foundations for the tanks, and that the leaks were entirely due to the faulty construction of such foundations. Plaintiff did not undertake to build and deliver unleakable tanks on the platforms furnished by the defendant. Its engagement was that the tanks would not leak at the time they were ready for delivery at its factory, which place was later changed as of the defendant's plant. The fact that after the tanks were completed and were resting upon the foundations constructed by the defendant, the plaintiff attempted to make them tight and assured defendant that they would be made tight, does not affect the original contract, but rather goes to a matter of business policy or expediency. Even at considerable cost and annoyance the plaintiff may have wished to entirely please defendant, not only for the purpose of influencing possible future business with the defendant, but for the sake of sustaining the business reputation of the plaintiff in the community in which it was transacting business. The whole question here involved depends primarily on the facts. [1] According to the findings by the lower court, those facts are all against defendant's contentions. At any rate, the court found that the platforms "were not accepted by the plaintiff; that the plaintiff assumed no obligations in regard to the foundations furnished by the defendant; that said tanks did comply with plaintiff's written guaranty and did comply with the express warranty found in Civil Code, section 1770, and were reasonably fit for the purpose for which they were manufactured, and that the leakages were caused by the defective platform furnished by the defendant." [2] The findings are supported by the evidence, and the rule is

unquestioned that in such circumstances the appellate court will not interfere with the judgment.

The judgment is affirmed.

Conrey, P. J., and Curtis, J., concurred.

A petition by appellant to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on July 17, 1924.

All the Justices concurred.